**The STATE of Ohio, Appellee,**

v.

**SPEER, Appellant.**

[Cite as *State v. Speer*, 180 Ohio App.3d 230, 2008-Ohio-6947.]

Court of Appeals of Ohio,
Sixth District, Ottawa County.

No. OT–07–046.

Decided Dec. 31, 2008.

Mark E. Mulligan, Ottawa County Prosecuting Attorney, and Lorrain R. Croy and Mary Ann Barylski, Assistant Prosecuting Attorneys, for appellee.

Bradley Davis Barbin and Mark R. Meterko, for appellant.

SINGER, Judge.

{¶ 1} This appeal comes to us from a decision issued by the Ottawa County Court of Common Pleas following a jury verdict finding appellant guilty of aggravated vehicular homicide and involuntary manslaughter. Because we conclude that the trial court abused its discretion in denying appellant's challenge for cause as it related to a hearing-impaired juror, we reverse.

{¶ 2} In two separate indictments based upon the same facts, appellant, Scott A. Speer, was indicted by the Ottawa County Grand Jury on four counts: one count of aggravated vehicular homicide, in violation of R.C. 2903.06(A)(2)(a); one count of involuntary manslaughter, in violation of R.C. 2903.04(B); one count of aggravated murder, in violation of R.C. 2903.01(A); and one count of murder, in violation of R.C. 2903.02(A). The indictments stemmed from the death of Jim Barnett when he fell from appellant's boat while out on Lake Erie.

{¶ 3} The two cases were consolidated, and a jury trial was held. During jury selection, one of the jurors revealed that she was hearing impaired to such a degree that she needed to read lips of any speakers in order to know what was being said. Appellant requested that she be excused "for cause," which, over appellant's objection, was denied by the trial court. At the end of voir dire, appellant used all four peremptory challenges on other jurors. The hearing-impaired juror was then included in the jury panel.

{¶ 4} At trial, the following evidence and testimony was presented that is relevant to the issues decided in this appeal. Testimony was presented that early on August 6, 2002, just before 2:00 a.m., appellant and a friend, Jim Barnett, were returning to East Harbor, Lake Erie, from Put-In-Bay in appellant's 24-foot power boat. According to appellant's prior statements, the wind increased, creating three- to six-foot waves, and Barnett, who refused to sit down, fell off the boat near Mouse Island, just off Catawba Point.

{¶ 5} Appellant called 911 from his cell phone. The call was recorded, and the tape was played for the jury. The tape revealed that appellant said he attempted to throw a line and a life ring to Barnett, but was unable to reach him. When appellant called 911 for help, he could not see Barnett and said he was still at the spot where Barnett had fallen in the water. Appellant at first said he was located off "Johnson's Island" near Catawba Point. The Coast Guard noted to appellant that Johnson's Island was not located off Catawba Point. Appellant again responded that he was off Catawba Point and asked for the name of the little island near there. When the Coast Guard stated that it was called "Mouse Island," appellant said that was where he was and where Barnett had fallen.

{¶ 6} While talking with the 911 operator and the Coast Guard, appellant said his boat was drifting into shallow water. Appellant noted several times that the water was rough and the wind was blowing hard. He left the phone once to move his boat into deeper water. He then returned to the phone and continued answering questions. After about 15 minutes, appellant stated that his cell phone was about to lose power and he could not wait any longer because of the rough water. The recording on the 911 tape then ended.

{¶ 7} Later, appellant told police that he then drove his boat back to his marina and carefully tied up at the dock. Appellant went to his nearby 31–foot power boat to allegedly change out of his wet clothing. At approximately 2:35 a.m., appellant placed a second 911 call. This call was erased and, consequently, was not available as evidence for review.

{¶ 8} Police officers soon arrived at the marina to interview appellant about the incident and to determine whether he was under the influence of alcohol. Testimony by police officers was also presented regarding appellant's performance on sobriety tests, his demeanor, his state of mind, and other alleged indications of impairment due to alcohol. The day after the incident, appellant and a friend found Barnett's body washed up on the shore of Mouse Island, near where the incident allegedly took place.

{¶ 9} Testimony was presented that indicated that appellant and Barnett had been long-time friends, but had recently had an argument over money allegedly owed by appellant to Barnett for work on a boat. In addition, Barnett's cousin testified that he and appellant had attended a social event some months after Barnett's death. The cousin was high on drugs at that time, but recalled that appellant had been drinking, had become upset, and had said that he had pushed Barnett on the night of the incident. Other witness testimony and evidence was also presented, which is not relevant for the purposes of our decision on this appeal.[1]

---

1. The coroner and her findings, and expert-witness testimony was offered by both sides as to the probable speed of the boat, the effects of the weather on the boat, the effects that being on

{¶ 10} The jury found appellant not guilty as to the aggravated-murder and murder counts, but found him guilty as to the aggravated-vehicular-homicide and involuntary-manslaughter counts. The trial court determined that the two convictions were allied offenses of similar import and sentenced appellant as to the aggravated-vehicular-homicide count. Appellant was sentenced to four years' incarceration, a $10,000 fine, and a suspended driver's license for five years. Appellant's motions for new trial and judgment of acquittal were denied.

{¶ 11} Appellant now appeals that decision, arguing the following three assignments of error:

{¶ 12} "I. The Trial Court erred by failing to disqualify a hearing impaired juror for cause.

{¶ 13} "II. The Trial Court erred in denying Appellant Speer's Motion for a New Trial where the participation of a hearing impaired juror denied Appellant Speer his right to a fair trial, impartial jury and unanimous verdict.

{¶ 14} "III. The Trial Court erred in relying upon facts, other information and conclusions, neither charged nor proven, thereby denying Appellant Speer his fundamental notice, comment and confrontation due process rights at sentencing."

{¶ 15} In his first assignment of error, appellant argues that the trial court abused its discretion in failing to excuse a hearing-impaired juror for cause. We agree.

{¶ 16} R.C. 2945.25 and Crim.R. 24(C) list the particular causes for which a prospective juror may be challenged in a criminal case. R.C. 2945.25 states:

{¶ 17} "A person called as a juror in a criminal case may be challenged for the following causes:

{¶ 18} " * * *

{¶ 19} "(O) That he otherwise is unsuitable for any other cause to serve as a juror." Crim.R. 24(C)(14) states the same "catch-all" provision.

{¶ 20} Whether to disqualify a juror for cause is " 'a discretionary function of the trial court * * * [not reversible] on appeal absent an abuse of discretion.' " *State v. Smith* (1997), 80 Ohio St.3d 89, 105, 684 N.E.2d 668, quoting *Berk v. Matthews* (1990), 53 Ohio St.3d 161, 559 N.E.2d 1301, syllabus. Generally, the trial court's ruling will not be overturned on appeal " 'unless it is manifestly arbitrary and unsupported by substantial testimony, so as to constitute an abuse of discretion.' " *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-

---

a boat would have on standard sobriety testing, and other issues not germane to our discussion.

5981, 836 N.E.2d 1173, ¶ 38, quoting *State v. Williams* (1997), 79 Ohio St.3d 1, 8, 679 N.E.2d 646.

■ {¶ 21} "Satisfactory jury service" must at least meet the constitutional requirements of a fair trial. See *In re Murchison* (1955), 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (a fair trial in a fair tribunal is a basic due-process requirement). A deaf juror's inability to fully participate due to the unavailability of an interpreter to assist the juror at trial has been held to be sufficient to excuse that juror for cause. See *Burke v. Schaffner* (1996), 114 Ohio App.3d 655, 683 N.E.2d 861. See also *Fendrick v. PPL Serv. Corp.* (C.A.3 2006), 193 Fed.Appx. 138 (striking hearing-impaired juror for cause was proper where accommodations could not assure juror's ability to hear proceedings during trial).

{¶ 22} Appellant was found guilty of both involuntary manslaughter and aggravated vehicular homicide. Therefore, in order to determine whether a hearing-impaired juror could have properly evaluated the evidence presented, we must look at what elements must be proved to establish those offenses.

{¶ 23} R.C. 2903.04(B), which designates the elements for involuntary manslaughter, provides that:

{¶ 24} "No person shall cause the death of another * * * as a proximate result of the offender's committing or attempting to commit a misdemeanor of any degree, a regulatory offense, or a minor misdemeanor * * *." Involuntary manslaughter carries with it the culpable mental state of the underlying crime being committed, which in this case was aggravated vehicular homicide.

{¶ 25} R.C. 2903.06(A)(2)(a), the aggravated- vehicular-homicide statute, provides that no person, in the operation of a watercraft shall recklessly cause the death of another. R.C. 2901.22(C) defines "recklessly" to be when a person acts "with heedless indifference to the consequences, * * *[and] perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist."

■ {¶ 26} Proof of excessive speed in the operation of a motor vehicle under a charge of aggravated vehicular homicide is generally not by itself sufficient to constitute wantonness or recklessness. *Akers v. Stirn* (1940), 136 Ohio St. 245, 16 O.O. 335, 25 N.E.2d 286, paragraph one of the syllabus, following *Morrow v. Hume* (1936), 131 Ohio St. 319, 6 O.O. 21, 3 N.E.2d 39, paragraph one of the syllabus. If accompanying facts show "an unusually dangerous situation and a consciousness on the part of the driver that his conduct will in common probability result in injury to another of whose dangerous position he is aware and he drives on without any care whatever, and without slackening his speed, in

utter heedlessness of the other person's jeopardy, speed plus such unusually dangerous surroundings and knowing disregard of another's safety may amount to wantonness." *Akers* at 249–250, 16 O.O. 335, 25 N.E.2d 286.

{¶ 27} On the other hand, the charge of vehicular homicide requires the offender to *negligently* cause the death of another. R.C. 2903.06(A)(3) and (C). "Negligently" is defined as follows:

{¶ 28} "(D) A person acts negligently when, because of a substantial lapse from due care, he fails to perceive or avoid a risk that his conduct may cause a certain result or may be of a certain nature. A person is negligent with respect to circumstances when, because of a substantial lapse from due care, he fails to perceive or avoid a risk that such circumstances may exist." R.C. 2901.22(D).

■ {¶ 29} Thus, in order to find a person guilty of aggravated vehicular homicide in the operation of a watercraft, a jury must find behavior that goes beyond negligence and includes an additional factor showing wantonness, i.e., use of alcohol or drugs, a perverse and deliberate disregard for the safety of others, or some other aggravating circumstance that is beyond a mere lapse in judgment. See *State v. Whitaker* (1996), 111 Ohio App.3d 608, 676 N.E.2d 1189. See also *State v. Caudill* (1983), 11 Ohio App.3d 252, 11 OBR 379, 464 N.E.2d 605 (speed, erratic driving, driving under the influence); *State v. Stinson* (1984), 21 Ohio App.3d 14, 21 OBR 15, 486 N.E.2d 831 (speed, wet pavement, curving road, car in disrepair, driving under the influence); *State v. Purdy* (Apr. 6, 1987), 12th Dist. No. CA86–06–078, 1987 WL 9074 (speed, erratic driving, driving under the influence); *State v. Thomas* (June 13, 1994), 12th Dist. No. 93–03–046, 1994 WL 266546 (motorist traveling 100 m.p.h., tailgating, and bumping car ahead in a partially residential area with a hill crest preceding intersection where collision occurred).[2]

■ {¶ 30} In this case, the hearing-impaired juror candidly acknowledged that she could understand what someone was saying only if she could see them, since she needed to read lips. She did not apparently read sign language, so an interpreter who could indicate to her when someone was speaking was not brought in by the court. Although she was moved to the front row and indicated a couple of times that she needed counsel to turn toward her, there is no way to determine whether she was aware of every time someone was speaking. As a result, it is unknown whether the juror received all the testimony. Use of a sign-language interpreter would have ensured that the juror would have been alerted every time someone spoke. Moreover, even the trial court noted that although it

---

2. Although these cases involved the operation of motor vehicles, the rationale and requirements regarding "recklessness" are illustrative and would also apply to the operation of a watercraft.

would try to do everything it could to accommodate the juror, it could not "guarantee that we will always be successful."

{¶ 31} Even more troubling in this case, however, is the problem represented by the 911 tape that was played for the jury. The state introduced evidence to attempt to show that appellant had been traveling too fast in his boat for the conditions or that he allegedly knew the weather forecast was bad. Since these acts alone would not have sufficiently established the elements for aggravated vehicular homicide, some other aggravating circumstance or action had to be shown.

{¶ 32} During closing arguments, the prosecution directed the jury to consider appellant's "demeanor on the 911 tape" and what that indicated. The prosecution also stated, "His reactions on that 911 tape say a lot of stuff, not just the words about him falling off the boat, not just about his messed up location." Consequently, the taped 911 call was offered to provide evidence of whether appellant's speech and conversation with the 911 dispatcher and Coast Guard indicated elements of the crimes charged: purposefulness or recklessness, i.e., whether appellant showed signs of physical impairment, slurred or hesitant speech, lack of good judgment, total disregard for another's safety, or his state of mind and sincerity in his search for Barnett.

{¶ 33} To evaluate the tape as evidence and determine its value in establishing the elements of the offenses, the jury had to listen to appellant's speech patterns, the inflections in his voice, the pauses in the conversation, and many other audio clues that would be meaningful only if actually heard. Although the hearing-impaired juror could read the words of the 911 tape as they were being transcribed, the words are subject to the court reporter's ability to convey every word. Moreover, mere written words would not have conveyed the nuance and inflection imparted by the spoken words. Since, in this particular case, the 911 tape had a direct bearing and correlation as to whether appellant acted recklessly and went to the elements of involuntary manslaughter and aggravated vehicular homicide, we conclude that the tape is the kind of evidence that could not be adequately or effectively evaluated by a hearing-impaired juror.

{¶ 34} We expressly note that in other cases, where the evidence involves only the bare meaning of the words, a juror's hearing impairment might have little or no prejudicial effect on his or her ability to effectively evaluate the evidence. As we have noted, however, the nature of the charges and evidence in this case required that all jurors be able to actually hear appellant's statements in order to fully evaluate that evidence. If any doubt exists that a juror can adequately and completely perceive and evaluate all the evidence, whether because of a physical impairment, mental capabilities, or other reason that would interfere with the performance of a juror's duties, the trial court must excuse that juror for cause.

Therefore, we conclude that the trial court abused its discretion in denying appellant's challenge for cause, and that error was prejudicial to appellant's receiving a fair trial.

{¶ 35} Accordingly, appellant's first assignment of error is well taken. In light of our disposition of appellant's first assignment of error, appellant's remaining assignments of error are moot.

{¶ 36} The judgment of the Ottawa County Court of Common Pleas is reversed, and the cause is remanded for proceedings consistent with this decision. Appellee is ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Ottawa County.

Judgment reversed.

PIETRYKOWSKI, P.J., and HANDWORK, J., concur.