[Cite as *In re Huff*, 2010-Ohio-3669.]

# IN THE COURT OF APPEALS OF OHIO
# THIRD APPELLATE DISTRICT
# PAULDING COUNTY

| | |
|---|---|
| **IN THE MATTER OF:** | **CASE NO. 11-10-01** |
| **NATHAN R. HUFF,** | |
| | **O P I N I O N** |
| **ALLEGED DELINQUENT CHILD.** | |

**Appeal from Paulding County Common Pleas Court**
**Juvenile Division**
**Trial Court No. 2009 2089**

**Judgment Affirmed**

**Date of Decision:  August 9, 2010**

**APPEARANCES:**

 *Timothy C. Holtsberry,* **for Appellant**

 *Matthew A. Miller,* **for Appellee**

**PRESTON, J.**

{¶1} Defendant-appellant, Nathan R. Huff (hereinafter "Huff") appeals the judgment of the Paulding County Court of Common Pleas, finding him a delinquent juvenile for committing criminal damaging. For the reasons that follow, we affirm.

{¶2} This matter stems from the events that occurred on September 11, 2009, when allegedly Huff (d.o.b. 4/17/92), operated his pickup truck in a manner which caused damage to another person's garage door. On September 24, 2009, a complaint was filed against Huff alleging that he was a delinquent under R.C. 2152.02(F) for violating R.C. 2909.06(A)(1), criminal damaging, a misdemeanor of the second degree if committed by an adult. On October 8, 2009, Huff was arraigned, an answer of "not true" was entered on his behalf, and he was appointed counsel. Pre-trial conferences were conducted on November 3, 2009 and November 24, 2009. Subsequently, adjudication and disposition hearings were held on December 22, 2009, and after the presentation of evidence, the trial court found Huff to be a delinquent juvenile. In addition, the trial court ordered him to serve ten (10) days in a juvenile facility, which was suspended on the condition that he attend school, pay restitution, and report to a probation officer until his eighteenth birthday. A motion for written findings of fact and conclusions of law

was filed on December 30, 2009, and the trial court entered its findings of fact and conclusions of law on January 4, 2010.

{¶3} Huff now appeals and raises three assignments of error. For ease of our discussion, we elect to address Huff's assignments of error out of the order in which they were presented in his brief.

### ASSIGNMENT OF ERROR NO. III

**THE ADJUDICATION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE**

{¶4} In his third assignment of error, Huff claims that his adjudication was against the manifest weight of the evidence.[1]

{¶5} A review of the manifest weight of the evidence in a juvenile delinquency adjudication is the same as for criminal defendants. *In re B.O.J.*, 10th Dist. Nos. 09AP-600, 09AP-601, 09AP-602, 2010-Ohio-791, ¶6. In determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'[weigh] the evidence and all reasonable inferences, consider the credibility of witnesses and [determine] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d

---

[1] In light of Huff's first assignment of error, we will address the manifest weight analysis without considering Deputy Deitrich's rebuttal testimony.

717. A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass* (1967), 10 Ohio St.2d 230, 231, 227 N.E.2d 212.

{¶6} Here, Huff was accused of committing criminal damaging. In order to be found delinquent for criminal damaging, the State had to prove beyond a reasonable doubt that Huff knowingly caused physical harm to property of another without consent. R.C. 2909.06(A). "A person acts knowingly * * * when he is aware that his conduct will probably cause a certain result." R.C. 2901.22(B). "'Physical harm to property' means any tangible or intangible damage to property that, in any degree, results in loss to its value or interferes with its use or enjoyment." R.C. 2901.01(A)(4).

{¶7} At the adjudication hearing, the State called Keith Myers (hereinafter "Myers"), who testified that he was the owner of the property in question and that at the time of the incident he had been building a house. (Nov. 22, 2009 Tr. at 5-6). On September 11, 2009, he said that he received a phone call from his niece informing him that someone had been back on the property and had been spinning around. (Id. at 6). As a result, Myers and his son-in-law went to the property and noticed that there was damage to his garage, specifically dents and punctures in the garage door. (Id. at 6-7); (State's Exs. 1 & 2). Myers identified several photographs which depicted numerous "punctures" and "indentions" in his garage door. (Id. at 8-9); (State's Exs. 1 & 2). In addition,

Myers stated that there were tracks in the stone driveway in front of his garage door and that "there were stones laying against the garage door too." (Id. at 8); (State's Exs. 1 & 2). Myers specifically testified that the damage shown in the photographs to the garage door had not been there before the incident. (Id. at 10).

{¶8} On cross-examination, Myers stated that he was having "a lot of people" help him build the house, and that his son-in-law and his father had been the ones that had installed the garage doors originally. (Id. at 12-13). Moreover, Myers acknowledged that the first time he went to the property after his niece had called he did not see any noticeable damage to the garage, and that it was only after his son-in-law had been out to the property and called Myers back out that he then noticed the indentations in the doors. (Id. at 13-14). Nevertheless, Myers testified that there had not been any tracks in the stone driveway up by the garage door prior to the incident. (Id. at 16-17).

{¶9} Next, the State called Brenda Smith (hereinafter "Smith"), Myers' niece who had called him the day of the incident to tell him that she had witnessed a two-toned truck pull into the driveway of his property. (Id. at 19-20). Smith explained that there had been prior reports of a two-toned blue pickup truck spinning around the neighborhood, and on the day of the incident, while she was at her grandmother's house, she noticed a two-toned blue pickup truck come up to the end of the stone road and "then all of a sudden they backed way up and then just started tearing up the stones and everything the whole way out." (Id. at 19).

Upon witnessing the actions of the pickup truck, Smith got into her car and decided to follow the truck. (Id.). Smith stated that the truck drove to another stone road; however, because of the dust that the truck was creating from driving on the stone road, Smith had to slow down. (Id.). When the dust cleared, she noticed tire tracks in the stones of Myers' driveway and that the tracks were headed onto Myers' property. (Id. at 20). So, Smith backed out on the road and waited to see what the truck was going to do. (Id.). Smith said that the truck eventually "came slowly out and then all of a sudden they just spun out and landed over in the ditch." (Id.). She took a few pictures of the two-toned blue pickup truck, one of which depicted the truck in the ditch, and both of which clearly showed the truck's license plate. (Id.); (State's Exs. 4 & 5). Next, Smith stated that she pulled up to the truck, but took off after the driver eventually noticed her and asked to talk to her. (Id.); (State's Exs. 4 & 5). At the adjudication hearing, Smith identified the driver of the two-toned blue pickup truck as Huff. (Id. at 21).

{¶10} On cross-examination Smith acknowledged that she could not see the truck while it was back by the house because the driveway curved around in the woods towards the house. (Id. at 25). Consequently, Smith did not see whether the truck had spun its tires by the house. (Id.). The only time she witnessed the truck spin its tires was when the truck came out of the driveway and landed in a ditch after spinning its tires. (Id.).

{¶11} The State additionally called Deputy Gary Deitrich of the Paulding County Sheriff's Office who was the officer that had responded to Myers' phone call regarding a pickup truck on his property. (Id. at 29). During this phone call, Deputy Deitrich was given the license plate number of the truck, and he said that Myers had just asked him to tell whomever the owner was of the truck to stay off his property. (Id.). Subsequently, Deputy Deitrich ran the license plate number and it came back as being registered to Gena Huff. (Id. at 29-30). He contacted Gena Huff and informed her about the complaint, at which time she admitted that her son Nathan would have been driving the truck at that time and said that she would talk to him about not going back on the property. (Id. at 30). The next day, Myers called the sheriff's office again, but this time it was to inform them that he had found some damage to his garage door. (Id.). While another deputy went over to the property to take some photographs, Deputy Deitrich went over to the Huff's residence and talked to Huff about the incident. (Id. at 31). Deputy Deitrich said that Huff acknowledged that he and two of his friends had been back on Myers' property, but that Huff denied spinning his tires. (Id. at 32).

{¶12} Finally, the State called Huff's friend, Joshua Sharp (hereinafter "Sharp"), to testify about the incident on September 11, 2009. Sharp stated that he had been with Huff that day in his truck, but while Huff had performed "donuts" in Myers' driveway, he stated that it had been at the beginning part of the stone driveway, not back by Myers' garage door. (Nov. 22, 2009 Tr. at 34-35). Sharp

said that Huff had "turned around in the back. Just did them [donuts] coming out of the driveway." In particular, on cross-examination, Sharp testified as follows:

> **Q. Then you drove back the driveway to check things out back there, drove back out, ahm, apparently you drove out slowly, then you saw this car setting there?**
> **A. Yeah**
> **Q. And then at the end of the driveway, Nathan punched and did a fishtail, half a donut and ended up in the ditch?**
> **A. Yeah**
> **Q. After you were, from the driveway to the road**
> **A. Yeah**
> **Q. No where near the house**
> **A. no, just turned around, looked back there at the nice house they had back there, turned around and**
> **Q. Okay, that's all I have**

(Id. at 37-38). Sharp acknowledged that he had told Deputy Deitrich that Huff had been doing donuts in Myers' driveway, but he said that he had never told Deputy Deitrich where in the driveway Huff had performed the donuts. (Id. at 36). On redirect, the State showed Sharp State's exhibits 1 and 2, which were photographs of Myers' garage door and the tire tracks in front of the garage door in the stone, and asked Sharp the following questions:

> **Q. Okay, does there appear to be burnout tracks in front of that?**
> **A. Yeah**
> **Q. And is that were abouts you turned your truck around?**
> **A. Yeah**
> **Q. Is it possible that you turned your truck around, or Mr. Huff turned his truck around in a manner that could have caused those marks?**
> **A. He might have turned a little sharply.**
> **Q. A little sharp?**
> **A. Yeah**

> **Q. He could have thrown some stones?**
> **A. Yeah**
> **Q. Maybe was going a little faster turning around?**
> **A. Yeah**

(Id. at 38-39).  However, Sharp said he was not certain whether Huff had caused the damage to Myers' garage door, since he never saw or heard any stones hit the house when they turned around.  (Id. at 40).

{¶13} Based on the above evidence we believe that finding Huff to be a delinquent child for committing criminal damaging was not against the manifest weight of the evidence.  There was testimony that the damage occurred to a house that was in the process of being built.  Moreover, Myers identified the indentations and punctures along his garage door and specifically testified that these indentations had not been there prior to the incident.  Additionally, there were photographs that depicted half circle track marks in the loose stone driveway and loose stones right next to the garage door, which again had not been there prior to the incident.  Furthermore, even though she could not see the pickup truck by the house, Smith observed the two-toned pickup truck spin its tires twice, one time being when it subsequently slid into a ditch.  Also, it is undisputed that Huff was the driver of this pickup truck.  Finally, despite Sharp's testimony that Huff had not done any donuts by the house, upon being shown the photograph depicting two half-circled track marks in the stones, Sharp admitted that Huff may have "turned a little sharply" by the house, and that stones could have been thrown as a result.

Therefore, based on the above, we find that Huff's adjudication was not against the manifest weight of the evidence.

{¶14} Huff's third assignment of error is, therefore, overruled.

**ASSIGNMENT OF ERROR NO. II**

**THE TRIAL COURT ABUSED ITS DISCRETION BY ALLOWING KEITH MEYERS TO GIVE OPINION TESTIMONY REGARDING THE DAMAGE TO THE GARAGE**

{¶15} In his second assignment of error, Huff claims that the trial court abused its discretion in allowing Myers to testify about the cause of the damage to his garage door.

{¶16} To begin with, the admissibility of relevant evidence rests within the sound discretion of the trial court. *City of Columbus v. Taylor* (1988), 39 Ohio St.3d 162, 164, 529 N.E.2d 1382, citing *Calderon v. Sharkey* (1982), 70 Ohio St.2d 218, 436 N.E.2d 1008. Absent an abuse of discretion, as well as a showing that the appellant suffered material prejudice, an appellate court will not disturb a trial court's ruling as to the admissibility of evidence. *State v. Martin* (1985), 19 Ohio St.3d 122, 129, 483 N.E.2d 1157. An abuse of discretion implies that the court's decision was unreasonable, arbitrary, or unconscionable, and not merely an error of judgment. *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶¶129-130, citations omitted. When applying the abuse of discretion

standard, an appellate court may not substitute its judgment for that of the trial court. *State v. Herring* (2002), 94 Ohio St.3d 246, 255, 762 N.E.2d 940.

{¶17} Lay witnesses may render a lay opinion on the ultimate issue to be decided by the trier of fact upon satisfaction of Evid.R. 701. *State v. McGovern*, 6th Dist. No. E-08-066, 2010-Ohio-1361, ¶33, citing *Lee v. Baldwin* (1987), 35 Ohio App.3d 47, 49, 519 N.E.2d 662. "Pursuant to Evid.R. 701, lay opinion must be: (1) 'rationally based on the perception of the witness,' i.e., the witness must have firsthand knowledge of the subject of his testimony and the opinion must be one that a rational person would form on the basis of the observed facts; and (2) 'helpful,' i.e., it must aid the trier of fact in understanding the testimony of the witness or in determining a fact in issue." Id., quoting *Lee*, 35 Ohio App.3d at 49, citing *Wheeler v. Hendershot* (Nov. 28, 1984), 1st Dist. No. C-830891.

{¶18} Here, Huff claims that the trial court abused its discretion when it allowed Myers to testify about what he believed had caused the damage to his garage door. In particular, after identifying the indentations in his garage door, the stones in front of his garage door, and the track marks in his stone driveway, Myers testified that it looked like someone had "spun around" in his driveway and "threw stones against [his] garage door." (Id. at 9-11). Generally, non-experts can state their opinion formed from facts that are based on matters within common observation and experience in cases where it is not practical to place before the trier of fact all the primary facts upon which they are founded. *State v. Hairston*

- 11 -

(1977), 60 Ohio App.2d 220, 223, 396 N.E.2d 773.  We believe that Myers' statement was a rational opinion based on facts that were matters within common observation and experience.  First of all, Myers' testimony demonstrated his familiarity with stone driveways.  Second, Myers testified that neither the stones in front of the garage door, the damage to the garage door, nor the tracks in the stone driveway had been there prior to the incident.  Moreover, after Smith had observed the two-toned truck drive back by the garage, Myers said that there were several indentations in his garage door, stones laying in front of his garage door, and two half circled track marks in the stones of his stone driveway.

{¶19} Given the evidence in the record, we believe that the trial court's decision to allow Myers' testimony was reasonable and not an abuse of discretion.

{¶20}  Huff's second assignment of error is, therefore, overruled.

## ASSIGNMENT OF ERROR NO. I

**THE TRIAL COURT ABUSED ITS DISCRETION BY ALLOWING HEARSAY TESTIMONY FROM DEPUTY DEITRICH REGARDING JOSHUA SHARP'S STATEMENT**

{¶21} In his first assignment of error, Huff argues that the trial court abused its discretion when it allowed Deputy Deitrich to be recalled on rebuttal and testify as to what Huff's friend, Joshua Sharp, had told him regarding the incident on September 11, 2009.  However, as we found in Huff's third assignment of error, Huff's adjudication was not against the manifest weight of the

evidence even without Deputy Deitrich's rebuttal testimony. Therefore, we find that Huff's first assignment of error is rendered moot.

{¶22} Accordingly, Huff's first assignment of error is overruled.

{¶23} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**SHAW, J., concurs.**

**ROGERS, J., concurs in Judgment Only.**

**/jnc**