[Cite as *State v. Swihart*, 2013-Ohio-4645.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
UNION COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                  CASE NO. 14-12-25

    v.

JOSHUA W. SWIHART,                   O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Union County Common Pleas Court
Trial Court No. 2011-CR-0056

Judgment Affirmed in Part, Reversed in Part and Cause Remanded

Date of Decision: October 21, 2013

APPEARANCES:

    *Caleb Carson, III* for Appellant

    *David W. Phillips* for Appellee

**ROGERS, J.**

{¶1} Defendant-Appellant, Joshua Swihart, appeals the judgment of the Court of Common Pleas of Union County convicting him of aggravated vehicular homicide and sentencing him to a prison term of fifty-four months. On appeal, Swihart argues that the trial court erred by (1) admitting improper lay person testimony regarding injuries he sustained in the automobile accident giving rise to this matter; (2) entering a verdict that was not supported by sufficient evidence; (3) entering a verdict that was against the manifest weight of the evidence; and (4) imposing sentence without addressing his objection to a factual allegation in the pre-sentence investigation report ("PSI"). For the reasons that follow, we affirm in part and reverse in part the trial court's judgment.

{¶2} On April 28, 2011, the Union County Grand Jury indicted Swihart with one count of aggravated vehicular homicide in violation of R.C. 2903.06(A)(2)(a), a felony of the third degree. The indictment arose from a June 21, 2010 automobile accident that caused the death of Ashley Bishop ("Ashley"), who was Swihart's girlfriend. The accident occurred at approximately 8:20 a.m. on State Route 47 west of York Center. Swihart was alleged to have been driving the automobile while Ashley was in the front passenger seat. After failing to negotiate a nearly 90-degree curve in the road, the automobile lost control and left the roadway. Immediately after leaving the roadway, the automobile turned, hit a

tree on its right side, and subsequently rolled over several times. The accident caused both Swihart and Ashley to be ejected from the cabin. Ashley died on impact while Swihart sustained a right leg injury and wrist fractures.

{¶3} The trial of this matter commenced on July 23, 2012 and ended on July 26, 2012. At trial, the following relevant evidence was adduced.

{¶4} Michael McCarty first testified regarding his discovery of the accident on June 21, 2010. Between 8:30 a.m. and 8:45 a.m. that morning, McCarty noticed a car wheel, tire, and hubcap next to the road as he drove by "a right sharp-hand curve" on State Route 47. July 23, 2012 Tr., p. 203. After seeing these items, McCarty directed the driver of the car to stop so that they could investigate the scene. He got out of the car and started to yell out to see if anyone was present. After eight to ten calls, McCarty heard a male voice respond:

> Q: * * * What happened? What were you doing and what was the person saying?
>
> A: Okay. I hollered and finally he answered, and I asked if he was all right. And he says [sic]: I can't move. And I says [sic]: is there anyone with you? And he says [sic]: I don't know.

*Id*. at p. 198. McCarty further testified that he could not see the automobile or people involved in the accident from the road. He also indicated that there were no tire marks on the road and that it was a sunny day.

{¶5} On cross-examination, McCarty further described the nature of State Route 47 near the accident site as follows:

Q: As you're approaching this curve, there's a slight rise and then you come over and that's when you see the curve?

A: Yeah.

*Id*. at p. 210.

{¶6} Thomas Bishop ("Thomas"), Ashley's father, was the next to testify. He indicated that Ashley had a black 1999 Mitsubishi Eclipse. Thomas also testified as follows regarding Swihart's statements to him at a memorial service for Ashley:

Q: Did [Swihart] say anything to you with regard to your daughter's death?

A: He made a comment that I think she was driving.

*Id*. at p. 225-26.

{¶7} James Smith, a paramedic and firefighter with Allen Township, then testified regarding his response to the accident. He arrived at the scene around 8:40 a.m. According to Smith, the car and people involved in the accident were not visible from the road. He observed that a nearby tree had bark torn off it and that there were several car parts strewn about the area. Since the responding paramedics were unable to see the people, they started to search in a nearby wooded area. In that area, Smith found a deceased female "and from there, we found [Swihart] further back into the area." *Id*. at p. 241. Smith described Swihart's positioning as follows:

Q: If you would, sir, do you remember where he was located when you found him?

A: He was further – from our entry point, he was off further into the wooded area, further to the right of where the female was, and he was propped against a tree. *Id*.

**{¶8}** As to Ashley's condition, Smith testified as follows:

Q: Describe her condition – when you found her, describe her condition to the jury, if you would.

A: She was supine, meaning she was on her back. Her face had been smashed in. She had numerous deformities and lacerations to her extremities. Her right foot was missing. Her right leg was partially amputated and she had been split open at the crotch and her entrails were exposed.

*Id*. at p. 243. He said that it was clear to the responding paramedics that Ashley was dead and that they could not render any medical care for her. Conversely, Smith described Swihart's injuries as follows:

He had lacerations to the back of the head, as indicated by the blood on the tree. He had bilateral wrist injuries, meaning he had injuries on both wrists; the right wrist was an open fracture, meaning that bone was exposed; the left wrist was swollen and deformed. The right leg was angled outward at an odd angle. The upper thigh was deformed and upon palpation presented with crepitus, which means it felt like a bag of potato chips.

*Id*. at p. 244. Smith further testified that he did not observe any injuries to Swihart's left leg.

**{¶9}** Smith discussed the import of Swihart's wrist injuries in the following exchange:

Q:    You indicated that he had injuries to his hands or to his wrists; is that correct?

A:    Yes, he did.

Q:    You've been out on automobile crashes before?

A:    Yes, I have.

Q:    Approximately how many?

A:    In the 9 years of service, I would say upwards – approximately 100.

Q:    And, sir, have you seen this kind of injury to the wrists before?

A:    These types of injuries would be common for someone gripping a steering wheel.

*Id*. at p. 245.  At this point, Swihart's defense counsel objected on the basis that the testimony lacked a proper foundation.  After a bench conversation, however, Swihart's defense counsel withdrew the objection.

{¶10} Smith also discussed his interaction with Swihart at the accident scene.  According to Smith, Swihart could remember his name, date of birth, and Social Security number, but some of his other statements "appeared to be of a confused nature."  *Id*. at p. 250.  Smith additionally testified that Swihart first told him that he was walking on the side of the road when the accident occurred.  After further questioning, however, Swihart said that he was the only person in the car.

{¶11} On cross-examination, Smith acknowledged that he may have missed some of Swihart's injuries, particularly to his left side. Additionally, the issue of Swihart's wrist injuries was again broached:

> Q: You testified about the injuries to [Swihart]'s wrists. If a car is coming straight into an object, your testimony about them sustaining wrist injuries if they are the driver, is that what you were telling us from experience?
>
> A: I'm saying from my studies, I know that it is noted in the study of motor vehicular accidents that it is common for drivers who are holding tightly to a steering wheel to sustain bilateral wrist injuries.

*Id.* at p. 270. Smith also admitted that he was unaware whether Swihart was the driver or not.

{¶12} Lieutenant James Strayton, the EMS coordinator with the Liberty Township Fire Department, also testified regarding the initial response to the accident scene. He observed the vehicle involved in the accident and testified that "[i]t was destroyed. We couldn't tell what kind of vehicle it was." *Id.* at p. 296. Lieutenant Strayton identified several grisly pictures of Ashley's body and her injuries.

{¶13} He also testified to Swihart's injuries. Specifically, on cross-examination, Lieutenant Strayton indicated that he observed injuries to Swihart's left side. On redirect examination, the following exchange occurred:

> Q: Sir, based upon your experience, what are the injuries to wrists, bilateral injuries consistent with?

* * *

A: Typically, that's something that's been hanging onto a steering wheel.

*Id*. at p. 307-08. Swihart's defense counsel objected to this exchange, but the trial court overruled the objection.

{¶14} Trooper Jeremy Allen of the Ohio State Highway Patrol then testified regarding his investigation of the accident scene. He indicated that the investigating officers found a license plate. From the license number, Trooper Allen learned that the car involved in the accident was a black Mitsubishi. He also described the location of the car parts, the body of the car, and the victims at the scene of the accident, which were "scattered over a wide swath of ground." July 24, 2012 Tr., p. 30. Moreover, Trooper Allen indicated that the right portion of the car's hood showed the largest impact, which suggested that the car's right side was the portion of the car that hit the tree.

{¶15} Trooper Allen testified that the airbags were removed to collect DNA evidence regarding the driver's and passenger's identities. He further stated that the airbags were kept separate from each other to preserve the integrity of any DNA evidence.

{¶16} Sarah Smith ("Analyst Smith"), a DNA analyst with the Ohio Bureau of Criminal Identification and Investigation ("BCI"), then testified that she examined the airbags and found that both contained blood and contact DNA,

which usually is found in skin cells and other non-bodily fluid cells. As a result, she cut a section from the front of both airbags and a section from the left side of the passenger's airbag. Analyst Smith also took swabs from each bag. She indicated that she sent the airbag sections to LabCorp for the additional DNA analysis.[1] Analyst Smith further testified that she found an earring in the passenger side airbag.

{¶17} On cross-examination, Analyst Smith acknowledged that she did not know how the airbags were placed inside their containers before deployment. She also said that it was not unusual to find items in airbags, especially when there was a car rollover. Analyst Smith further admitted that DNA transfer onto the airbags could have occurred either during the original impact or during the car rollover.

{¶18} Shawn Weiss, the associate technical director for forensic identification of LabCorp, then testified regarding the analysis he performed of the DNA contained on the airbag sections. As to the driver's airbag, Weiss testified as follows:

> Q: * * * Tell us, were you able to draw any conclusions with regard to the cuttings * * * from the driver's side airbag?
>
> A: The cutting from the * * * driver's side * * * we were able to get a partial profile. A partial profile is where we're getting results at some of the systems and not all the systems. That partial profile was consistent with Joshua Swihart.

---

[1] According to Analyst Smith, BCI farms out a portion of their DNA samples for additional analysis to LabCorp due to BCI's backlog of samples.

*Id.* at p. 75.  Meanwhile, in regard to the passenger's air bag, Weiss testified as follows:

> Q:   Tell us what conclusions that you reached from the passenger side swab [from the front of the airbag]?
>
> A:   Again, we were picking up a mixture.  The major profile was consistent with [Ashley].  * * * We excluded [Swihart] from being the major source of the sample.

*Id.* at p. 77-78.  According to Weiss, the DNA in the blood sample taken from the driver's side of the passenger's air bag was consistent with Swihart.  Weiss testified as follows regarding the probabilities behind his conclusions:

> A:   Mr. Swihart could not be excluded [as] the source of the DNA from the driver's side airbag.  The probability of randomly selecting an unrelated individual with the partial DNA * * * is 1 in greater than 2,900,000,000 for the African-American population, 1 in 24,200,000 for the Caucasian population, and 1 in 226,000,000 for the Hispanic population.
>        We also calculated it for a major profile from the cutting of the passenger side air bag [on the driver's side].  These statistics were 1 in greater than 6.8 billion * * *.
>
> * * *
>
> Q:   Now, as far as the swab from the passenger side air bag, what probability did you come up with?
>
> A:   Ashley Bishop couldn't be excluded [as] the source of DNA from the passenger side air bag.  This is from the swabbings.  The probability of randomly selecting an unrelated individual with a DNA profile consistent with the major DNA profile from the sample is, again, 1 in greater than 6.8 billion for the African-American, Caucasian, and Hispanic populations.

*Id.* at p. 81-82.

{¶19} Dr. Susan Allen, a forensic pathologist with the Montgomery County Coroner's Office, was the next to testify.  She indicated that she conducted the autopsy of Ashley.  During the autopsy, Dr. Allen noted "a lot of blunt force injuries, [including] abrasions or scrapes, lacerations or tears of the skin, bruising, and her right foot was traumatically amputated from her leg."  *Id.* at p. 99.  She testified that Ashley's injuries "for the most part" were on the right side of her body.  *Id.* at p. 101.  Based on her autopsy, Dr. Allen concluded that the cause of Ashley's death was multiple blunt force injuries that were consistent with an automobile accident.

{¶20} Sergeant James Highsmith of the Ohio State Highway Patrol then testified regarding his investigation of the accident.  He learned in the course of his investigation that Swihart was required to be in Bellefontaine for a court hearing at 9:00 a.m. on the morning of the accident.  After learning this, Sergeant Highsmith went to the hospital where Swihart was receiving treatment.  He subsequently asked Swihart several questions, including the following:

> Q:   And, sir, did you ask him who the driver was?
>
> A:   I did.  * * * I said: At this stage of the investigation, we are still trying to determine who the driver was.  Can you tell me who the driver was?  His response was: I think it was me.

*Id*. at p. 124.

{¶21} Sergeant Highsmith testified that during their discussion at the hospital, Swihart indicated that the Mitsubishi belonged to Ashley but that he "sometimes" drove it.  *Id*. at p. 125.  Sergeant Highsmith also testified to the following exchange between him and Swihart as to car's speed at the time of the accident:

Q:  Tell us the question that you asked him, please.

A:  I said: Do you remember how fast you were traveling?

Q:  What was his answer?

A:  His answer was: Probably 55, just because her speedometer was off.  It said 65, which means 55.  It was off by 10 miles per hour.

*Id*. at p. 126.  Sergeant Highsmith indicated that Swihart was coherent during the course of his questioning and that Swihart did not appear medically incapable of providing accurate answers.

{¶22} On cross-examination, Sergeant Highsmith discussed Swihart's speed before the crash in the following exchange:

Q:  The speed limit on Route 47 is 55, correct?

A:  Yes.

Q:  You didn't ask him: Do you remember how fast you were traveling in the curve, right?

A:  That is correct.

> Q: So his answer of going 55 miles an hour is completely appropriate for that road?
>
> * *
>
> A: For the speed limit on 47, yes.

*Id.* at p. 144-45. Sergeant Highsmith also discussed Swihart's statements about his knowledge of the curve in the road on State Route 47:

> Q: You asked [Swihart] how often he went around that curve?
>
> A: Yes. My exact question was: How often do you travel on State Route 47 around the curve?
>
> Q: And his answer was: once a week.
>
> A: That is correct.
>
> Q: And you know from your investigation that his residence was less than a mile from the curve?
>
> A: Yes.

*Id.* at p. 150.

{¶23} Sergeant Ty Skaggs of the Ohio State Highway Patrol also testified regarding his investigation of the accident. He is a motor vehicle crash scene reconstruction officer with extensive training and experience in that field. As a result, Sergeant Skaggs performed a reconstruction analysis of the accident scene in this matter. Based on his observation of the scene and investigation of the crash, he concluded that "it was a high speed collision." *Id.* at p. 215.

**{¶24}** As part of his reconstruction, Sergeant Skaggs surveyed the roadway surrounding the accident scene. Before the curve, he saw a curve warning sign and in the curve he saw another road sign. Sergeant Skaggs described these signs as follows: "[T]he curve warning sign shows a sharp curve to the right and back to the left with a suggested speed of 25 miles per hour and then further ahead, actually in the curve, the large arrow sign pointing to the right indicating further – a curve to the right." *Id*. at p. 216. After his observation of the accident scene, Sergeant Skaggs calculated that a car could only safely traverse the curve at a speed of 47 miles per hour or less.

**{¶25}** Sergeant Skaggs indicated that after the Mitsubishi went off the road, its right side slammed into the nearby tree, which caused the car to rotate clockwise in a rollover. Sergeant Skaggs also concluded, based on his observations of the accident scene and the injuries sustained by Ashley and Swihart, that Swihart was the driver of the Mitsubishi and that Ashley was the passenger. He summarized the basis for his conclusion as follows:

> Well, in talking about the injuries to the occupants, we've heard testimony already from several people about the injuries sustained by [Ashley]. Predominantly right side of the body had sustained more trauma than the left side.
> If I recall correctly from some of the other testimony, I believe that [Swihart] also seemed to have more trauma to the right half of the body than the left. Again, that goes to the fact that this vehicle rotates out around this way and they wind up coming to contact with the interior components [of the vehicle].

-14-

If I recall correctly, [Swihart] had severe damage to his right leg. That probably would have caused from [sic] the console of the vehicle. That's typical of a driver when you have a vehicle that rotates in a clockwise manner, they have that impact and receive, you know, more injury to their right leg than their left legs as a result of clockwise rotation when they're in position.

And then also comparing the extent of overall injuries between [Swihart] and [Ashley], [Ashley] suffered much more severe trauma; so that leads to the fact that [Ashley] was the passenger and [Swihart] was the driver.

*Id*. at p. 241.

**{¶26}** On cross-examination, Sergeant Skaggs acknowledged that a rise in the roadway concealed the curve on State Route 47. He also admitted that an automobile driving 55 miles per hour in the stretch of roadway before the curve was driving within the speed limit. Sergeant Skaggs also indicated that the Mitsubishi started to turn into the corner in a normal fashion before losing control. As to the cause of the loss of control, Sergeant Skaggs testified as follows:

In my opinion, the vehicle was traveling too fast for the curve to complete – to go through the curve safely. As I stated before, the driver of the vehicle did put some steering input into the vehicle – you know, knew the curve was there and started to steer, but was not able to complete the steering movement; then also the extreme damage to the vehicle, the distance it traveled and everything shows that the vehicle was traveling too fast to safely traverse the curve.

*Id*. at p. 259.

**{¶27}** Sergeant Skaggs also acknowledged that he was unable to precisely determine the location in the curve where the Mitsubishi lost control. He also indicated that it was possible that the driver of the car could have been placing the

same "turn input" into the car throughout the entire curve. Nevertheless, when asked whether it was possible that the cause of the accident was simply that the driver did not react in time to turn the vehicle through the curve, Sergeant Skaggs testified as follows:

> Well, that's one possible explanation; but looking at the amount of damage to the vehicle and how far it traveled and everything, regardless of how much steering input was or was not put into it, that vehicle would not have made that curve that day regardless of the steering input.

*Id*. at p. 267.

**{¶28}** In regard to Sergeant Skaggs' conclusion that Ashley was not the driver, the following exchange occurred:

> Q: * * * If she was the driver, would your testimony then be that it's not probable or not possible that she might have lost her foot somewhere within the driver's area of the vehicle? Did you consider that in your evaluation?
>
> A: Yes. In looking at her being on the driver's side, that is not consistent with, you know, the overall circumstances of the case, given her injuries and [Swihart]'s injuries and the extent of damage to the right half versus the left half of the vehicle.

*Id*. at p. 272-73. This testimony led to the following exchange regarding Sergeant Skaggs' conclusion that Swihart was the driver:

> Q: You had mentioned in your testimony that [Swihart] had also suffered injuries primarily to his right side, his leg?
>
> A: That's what I – I mean, I didn't examine him, but that's what I recall being put in other reports by the medical examiners.

Q: And you'd agree with me that that would also make it possible that he was the passenger if he had lower right leg and right side injuries?

A: No, not given all of the circumstances of the case.

Q: Why?

A: Because of the difference and the extremity of the injuries to the right half of [Ashley]'s body versus [Swihart]'s body and the severity of the damage to the vehicle of the right side of the vehicle, again, the hood, the right front tire, passenger door, the floor pan, and everything would be on the right side versus the amount of damage that was on the left side where the passenger's legs and feet would have been.

*Id*. at p. 273-74.

{¶29} After Sergeant Skaggs' testimony and a variety of its exhibits were admitted into evidence, the State rested. Swihart responded with a Crim.R. 29 motion for acquittal on the basis that there was insufficient evidence showing that Swihart was the driver of the Mitsubishi and that he was reckless in causing the accident. The trial court overruled the motion.

{¶30} Swihart's first witness was Rickey Stansifer, an engineering consultant, who was offered as an expert in the field of accident reconstruction analysis. He testified that there were "gaps" in Sergeant Skaggs' analysis and that those gaps rendered it "incomplete." July 25, 2012 Tr., p. 34. As to Sergeant Skaggs' conclusion that Ashley was the passenger and that Swihart was the driver, Stansifer testified as follows:

> I observed that Mr. Swihart's lower right foot was also severely crushed as was his right femur, I believe; so either [Ashley or Swihart] could be involved at that stage. So [the injuries don't] necessarily lead me to believe that [Ashley] was necessarily the passenger.

*Id*. at p. 63.

**{¶31}** Stansifer also indicated that "[o]nce [a car] begins to rotate, things become too complicated to predict" and that any conclusions regarding the movement of car occupants in a rollover are unreliable. *Id*. at p. 64. As a result of this, and other uncertainties in the analysis of car accidents such as this one, Stansifer said that "[y]ou can't say where [Swihart] started in the vehicle." *Id*. at p. 71. To conclude this line of questioning, the following exchange occurred:

> Q: And does [the uncertainty] affect your ability to tell the jury in your professional opinion to a reasonable degree of scientific certainty who was the driver or who was the passenger?
>
> A: It does affect me and I can't determine to a certainty * * * which person was the driver in this case * * *.

*Id*. at p. 72. Despite generally criticizing Sergeant Skaggs' conclusions and analysis, Stansifer testified that Sergeant Skaggs' findings were "possible." *Id*. at p. 73.

**{¶32}** Stansifer then indicated that when there is a car rollover, "blood droplets can scatter and spatter almost anywhere in the interior of the vehicle." *Id*. at p. 81. He also testified that the Mitsubishi was not traveling at a high rate of speed that precluded it from safely traversing the curve. To Stansifer, the lack of

-18-

yaw marks on the road meant "that the car was never in the condition of exceeding its limits of traction." *Id*. at p. 86. In other words, according to Stansifer, "the driver was not demanding more cornering ability than the car could produce." *Id*. Further, he testified that the speed of the car was probably in the 35 miles per hour range at the time of the accident.

{¶33} On cross-examination, Stansifer acknowledged that he did not personally observe the accident scene before preparing his report and conclusions. He also admitted that the scope of his work was to "render a professional opinion as to [the] speed and cause [of the accident,]" not to address the identities of the driver and passenger. *Id*. at p. 116. As to the basis for Stansifer's conclusions, the following exchange occurred:

> Q: So if information was missing from your analysis, your opinions would be somewhat suspect, would they not, sir?
>
> A: They may necessarily be incomplete.

*Id*. at p. 117. After this acknowledgment, Stansifer admitted that he did not review the coroner's report, the DNA analyses, or pictures of the inside of the Mitsubishi before rendering his opinion. Moreover, regarding the speed of the car at the time of the accident, the following exchange occurred:

> Q: And, in fact, when you talked about – at the end of your testimony, you were talking about a 35-mile-an-hour speed to collide with the tree.
>
> A: Yes.

Q: Now, actually, that's the minimum – that's just to cause the damage to the car. You're not saying this vehicle was traveling at 35?

A: No. No.

Q: As a matter of fact, the vehicle had to be traveling well in excess of 35 because * * * the damage to the car, that, in and of itself, would be caused by at least a 35-mile-an-hour crash?

A: That's what I said, yes.

*Id.* at p. 121-22.

{¶34} Randall Swihart ("Randall"), Swihart's father, was the next to testify. He indicated that he did not recall telling Sergeant Highsmith that Swihart usually drove the Mitsubishi when he was with Ashley. According to Randall, even if he did make this statement, it would be inaccurate because Swihart and Ashley evenly divided the driving of the Mitsubishi. As to Sergeant Highsmith's questioning of Swihart at the hospital, Randall testified that Swihart had just gotten out of surgery before Sergeant Highsmith's arrival. Randall further described the questioning as follows:

Q: And eventually what happened with you and the trooper?

A: Eventually I walked up and stood beside [Swihart] – I was towards his shoulder just to be there and the state trooper, he got down around the knees of the bed.

Q: And then what did you do next?

A: He started asking [Swihart] questions. I woke [Swihart] up pretty much for every question, had to shake him – not shake him, but I mean, talk to him and try to wake him up. His eyes would open – I mean, pretty much asked most questions multiple times to try to, you know, keep him awake to get him to answer the questions.

*Id.* at p. 183-84. On cross-examination, Randall acknowledged that Swihart made a number of accurate statements to Sergeant Highsmith during the questioning, including those relating to his scheduled court appearance for the morning of the accident.

{¶35} Andrew Nichelson, one of Swihart's friends, then testified about his observation of Swihart's condition in the hospital around the time of the questioning by Sergeant Highsmith. According to Nichelson, Swihart was nonresponsive when he first arrived in Swihart's hospital room about 30 minutes after the questioning. Specifically, Nichelson described his interaction with Swihart in the hospital as follows: "Before I left the room, [Swihart] did look over once and he said: Where's Ashley? And then he just turned back straightforward and was back into that like daze that he was in where his eyes were barely open." *Id.* at p. 212. On cross-examination, Nichelson admitted that he was not present when Sergeant Highsmith questioned Swihart.

{¶36} After the admission of his exhibits, Swihart rested and renewed his Crim.R. 29 motion for acquittal. The trial court again overruled the motion. The State then recalled Sergeant Skaggs to rebut some of the criticisms leveled by

Stansifer in his testimony. After the State and Swihart offered their closing arguments and the trial court delivered its jury instructions, the jury retired for deliberations.

{¶37} On July 26, 2012, the jury returned a guilty verdict on the sole count alleged in the indictment. This matter then proceeded to sentencing. On September 4, 2012, the trial court conducted a sentencing hearing. At the hearing, Swihart's counsel made the following statement regarding the PSI's allegation that Swihart was laughing during the trial:

> I sat here the entire time next to [Swihart]. I believe we were on video the entire time. [Swihart] never acted inappropriately. The Court never admonished [Swihart] for any of his behavior during the trial. And I would object to that language being in the PSI because I don't think it's true.

Sentencing Tr., p. 9.

{¶38} After hearing statements from Swihart and his parents, the trial court stated as follows:

> The Court's considered the record, the joint sentencing recommendation, the oral statements of those who have spoken today, including the victim impact statements, the need for deterrence, incapacitation, rehabilitation, and restitution, the principles and purposes of sentencing under Revised Code Section 2929.12.

*Id*. at p. 18-19. Based upon its consideration of these factors, the trial court ordered that Swihart serve a prison term of 54 months. The trial court

subsequently issued a judgment entry journalizing Swihart's conviction and sentence.

{¶39} Swihart timely appealed this judgment, presenting the following assignments of error for our review.

### Assignment of Error No. I

**THE TRIAL COURT ERRED WHEN IT ALLOWED LAY OPINION TESTIMONY REGARDING THE WRIST INJURIES SUFFERED BY THE APPELLANT.**

### Assignment of Error No. II

**THE EVIDENCE AGAINST THE APPELLANT IS INSUFFICIENT AS A MATTER OF LAW AND HIS CONVICTION FOR AGGRAVATED VEHICULAR HOMICIDE IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

### Assignment of Error No. III

**THE TRIAL COURT ERRED IN SENTENCING THE APPELLANT WHEN IT FAILED TO ADDRESS DEFENSE COUNSEL'S OBJECTION TO AN ALLEGATION IN THE PRE-SENTENCE INVESTIGATION REPORT OF THE APPELLANT'S ALLEGED IMPROPRIETY DURING TRIAL.**

### Assignment of Error No. I

{¶40} In his first assignment of error, Swihart argues that both Smith's and Lieutenant Strayton's testimony regarding his wrist injuries was inadmissible opinion testimony under Evid.R. 701. We disagree.

*Smith's Testimony*

**{¶41}** Although Swihart originally objected to Smith's testimony about his wrist injuries, he subsequently withdrew it before the trial court ruled. Due to the withdrawal of the objection, Swihart waived all but plain error in the admission of Smith's testimony. *State v. Netherland*, 132 Ohio App.3d 252, 262 (1st Dist. 1999). To have plain error under Crim.R. 52(B), the error must be an "obvious" defect in the trial proceedings that affected the defendant's "substantial rights." *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). Plain error is to be used "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id*. Further, plain error only exists where "but for the error, the outcome of the trial would clearly have been otherwise." *State v. Biros*, 78 Ohio St.3d 426, 431 (1997).

**{¶42}** Evid.R. 701 governs opinion testimony by lay witnesses and provides as follows:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

Our previous decision in *State v. Spivey*, 3d Dist. Marion No. 9-12-27, 2013-Ohio-851, provides significant guidance when applying Evid.R. 701 to the admission of Smith's testimony. There, an investigating officer testified that the appearance of

the windshield wiper on the defendant's automobile suggested that someone was hanging off of it. *Id*. at ¶ 48. The defendant appealed the trial court's admission of the testimony under Evid.R. 701, but we found no error based on the following reasoning:

> As to [the officer]'s testimony about the windshield wiper, he indicated that he personally observed [the defendant]'s automobile * * *. Due to this experience and personal observation, he rationally concluded that the windshield wiper appeared as though someone had been hanging off of it. This testimony was helpful to the jurors in determining whether [the defendant] jumped onto the hood of the automobile when [the victim] started to drive. Accordingly, we find no error in the trial court's admission of [the officer]'s testimony.

*Id*. at ¶ 52; *accord State v. Tillman*, 6th Dist. Fulton No. F-11-006, 2012-Ohio-5265, ¶ 13-14 (finding that testimony of police officer with experience in light arms instruction regarding the commonality of the defendant's pistol was proper under Evid.R. 701 since it related to the officer's observation of the pistol and was helpful to the jurors); *State v. Primeau*, 8th Dist. Cuyahoga No. 97901, 2012-Ohio-5172, ¶ 75 (finding that testimony of police officer regarding the defendant's hand lacerations was proper under Evid.R. 701 since it was based on the officer's "experience as a police officer, his previous investigation of assaults, and his perception of [the defendant]'s lacerations at the time"); *State v. Trefney*, 11th Dist. Portage No. 2011-P-0032, 2012-Ohio-869, ¶ 44 ("The deputy's opinion testimony is proper under Evid.R. 701. * * * As part of her investigation of domestic violence complaints, she is often called upon to examine the injuries

alleged by domestic violence victims and evaluate their account of the causes of the injuries. She personally observed the redness in [the victim]'s neck and upper arm, which, in her assessment based on her experience, was consistent with [the victim]'s account of the cause of the injuries.").

{¶43} Here, Smith testified to his extensive experience in responding to car accidents and treating injuries sustained in them. Based on this experience and his perception of Swihart's wrist injuries, Smith gave his opinion that Swihart's wrist injuries were consistent with those typically experienced by drivers. Since the opinion related to Smith's experience and observations, we cannot find that the trial court *plainly erred* in admitting his testimony regarding the wrist injuries.

*Lieutenant Strayton's Testimony*

{¶44} Unlike above, Swihart properly objected to Lieutenant Strayton's testimony. As such, we review the trial court's admission of his testimony for an abuse of discretion. *In re Huff*, 3d Dist. Paulding No. 11-10-01, 2010-Ohio-3669, ¶ 16. A trial court will be found to have abused its discretion when its decision is contrary to law, unreasonable, not supported by the evidence, or grossly unsound. *State v. Boles*, 2d Dist. Montgomery No. 23037, 2010-Ohio-278, ¶ 16-18. When applying the abuse of discretion standard, a reviewing court may not simply substitute its judgment for that of the trial court. *State v. Slappey*, 3d Dist. Marion No. 9-12-58, 2013-Ohio-1939, ¶ 12.

{¶45} Here, Lieutenant Strayton testified that Swihart's injuries were consistent with those typically sustained by automobile drivers in accidents. Before doing so, he indicated that he had experience in responding to automobile accidents and was trained to identify injuries typically sustained in accidents. However, Lieutenant Strayton did not indicate that he had experience observing this type of wrist injury in previous accidents. Further, he did not state that his training gave him the necessary knowledge to identify drivers of automobiles on the basis of their wrist injuries. Absent this foundation, it was improper for the trial court to admit Lieutenant Strayton's testimony about the wrist injuries.

*Harmless Error*

{¶46} Even though the trial court erred in admitting Lieutenant Strayton's testimony, we nevertheless find that there was no reversible error in its admission. Smith's testimony regarding the wrist injuries was already properly admitted without objection by Swihart, thus reducing any potential prejudice that could potentially come from Lieutenant Strayton's testimony. Further, the State offered an overwhelming amount of evidence beside Lieutenant Strayton's testimony to suggest that Swihart was the driver of the Mitsubishi. It offered the expert opinion testimony of Weiss indicating that the DNA on the driver's airbag and the driver's side of the passenger's airbag belonged to Swihart and that the DNA on the front of the passenger's airbag belonged to Ashley. Further, the State elicited Sergeant

Skaggs' expert opinion that Swihart was the driver and Ashley was the passenger. Finally, Sergeant Highsmith testified that Swihart said he thought he was the driver before the accident. Moreover, at oral argument on appeal, Swihart's counsel conceded that Swihart was the driver of the Mitsubishi. This overwhelming evidence, combined with Swihart's concession on appeal, is more than sufficient to establish that Swihart was the driver of the Mitsubishi. As such, any potential error in admitting the challenged testimony was harmless.

{¶47} Accordingly, we overrule Swihart's first assignment of error.

*Assignment of Error No. II*

{¶48} In his second assignment of error, Swihart contends that the verdict was not supported by sufficient evidence and that it was against the manifest weight of the evidence. We disagree.

*Sufficiency Standard*

{¶49} When an appellate court reviews the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, ¶ 47. Sufficiency is a test of adequacy. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997), *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89 (1997).

Accordingly, the question of whether the offered evidence is sufficient to sustain a verdict is a question of law. *State v. Wingate*, 9th Dist. Summit No. 26433, 2013-Ohio-2079, ¶ 4.

*R.C. 2903.06(A)(2)(a)*

**{¶50}** Ohio's aggravated vehicular homicide statute relevantly provides as follows: "No person, while operating or participating in the operation of a motor vehicle * * * shall cause the death of another * * * recklessly." R.C. 2903.06(A)(2)(a). The Revised Code declares that "[a] person acts recklessly when, in heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature." R.C. 2901.22(C). It further states that "[a] person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist." *Id*. Based on the terms of R.C. 2903.06(A)(2)(a), the State was required to prove the following elements to secure a conviction in this matter: (1) the defendant operated a motor vehicle, (2) in a reckless fashion, (3) which caused the death of another. *State v. Wheeler*, 6th Dist. Lucas No. L-06-1125, 2007-Ohio-6375, ¶ 19. Swihart's sufficiency argument challenges both the first and second elements, which we discuss below in turn.

*Evidence of Swihart's Operation of a Motor Vehicle*

{¶51} Swihart first argues that there was insufficient evidence to prove that he was the driver of the Mitsubishi. However, as discussed above in our resolution of the first assignment of error, a review of the record reveals that the State offered an overwhelming amount of evidence suggesting that Swihart was the driver of the vehicle. This evidence included the following: (1) Weiss's testimony regarding the DNA samples taken from the passenger's and driver's airbags; (2) Sergeant Skaggs' expert opinion that Swihart was the driver and Ashley was the passenger; and (3) Swihart's own statements to Sergeant Highsmith. In light of this extensive evidence, we are unable to find that the State failed to provide sufficient evidence establishing that Swihart was the driver of the Mitsubishi.[2]

*Evidence of Swihart's Recklessness*

{¶52} Swihart next argues that there was insufficient evidence to prove that he recklessly caused Ashley's death. Drawing from the statutory definition of recklessness, this court has previously described the recklessness element of aggravated vehicular homicide as focusing on "the state of mind of the defendant as to (1) the known risk, and (2) his perverse disregard of same with heedless indifference to the consequences." *State v. Gates*, 10 Ohio App.3d 265, 267 (3d

---

[2] Moreover, we note that at oral argument, Swihart's appellate counsel conceded that there was sufficient evidence to establish that Swihart was the driver of the Mitsubishi.

Dist. 1983). In applying this formulation of recklessness, Ohio courts have long recognized that "[p]roof of excessive speed in the operation of a motor vehicle under a charge of aggravated vehicular homicide is generally not by itself sufficient to constitute * * * recklessness." *State v. Speer*, 180 Ohio App.3d 230, 2008-Ohio-6947, ¶ 26 (6th Dist.), *aff'd* 124 Ohio St.3d 564, 2010-Ohio-649, citing *Akers v. Stirn*, 136 Ohio St. 245 (1940), paragraph one of the syllabus[3]; *accord State v. Roberts*, 8th Dist. Cuyahoga No. 97709, 2012-Ohio-4715, ¶ 17 ("[S]peed alone is not sufficient to constitute recklessness."). Rather, for a defendant to be guilty of aggravated vehicular homicide, "a jury must find behavior that goes beyond negligence and *includes an additional factor*[, such as] use of alcohol or drugs, a perverse and deliberate disregard for the safety of others, or some other aggravating circumstance that is beyond a mere lapse in judgment." (Emphasis added.) *Speer* at ¶ 29; *see, e.g.*, *State v. O'Brien*, 11th Dist. Lake No. 2011-L-011, 2013-Ohio-13, ¶ 83-84 (finding sufficient evidence of recklessness to support aggravated vehicular homicide where the defendant was driving at a high rate of speed and in a "zigzagging" manner); *State v. Monigold*, 7th Dist. Columbiana No. 03 CO 25, 2004-Ohio-1554, ¶ 25-26 (finding sufficient evidence for recklessness to support aggravated vehicular homicide where the defendant was driving at a

---

[3] *Speer* involved the alleged reckless operation of a motor boat. Nevertheless, its formulation of the contours of recklessness under R.C. 2903.06(A)(2)(a) relied exclusively on cases relating to the operation of motor vehicles. Accordingly, *Speer*'s precepts apply with full force in this matter even though it involves the operation of a motor vehicle. *Compare Speer* at ¶ 29, fn. 2 (noting that the court relied on cases "involv[ing] the operation of motor vehicles" and that "the rationale and requirements regarding 'recklessness' are illustrative and would also apply to the operation of watercraft").

high rate of speed and fishtailed on the return trip down the road after having done so on the defendant's first trip up the road); *State v. Ward*, 4th Dist. Ross No. 03CA2703, 2003-Ohio-5847, ¶ 12 (finding sufficient evidence of recklessness to support aggravated vehicular homicide where the defendant was driving under the influence of alcohol).

{¶53} The sufficiency of the evidence regarding Swihart's recklessness is a close call. However, after reviewing the case law on this issue and the evidence adduced by the State, we find that there was sufficient evidence to support Swihart's aggravated vehicular homicide conviction. The State presented evidence at trial, through Sergeant Highsmith's testimony, that Swihart lived merely one mile away from the curve in State Route 47 where the accident occurred and that he drove on the roadway at least once a week. It also presented evidence, through Sergeant Skaggs' testimony, that there were two road signs indicating the presence of the curve, including one that listed a suggested speed of 25 miles per hour. This evidence was sufficient for the jury to conclude that Swihart knew of the curve, its dangers, and the need to decelerate as it was approaching.

{¶54} Further, Sergeant Skaggs testified that the maximum speed at which one could traverse the curve was 47 miles per hour. Swihart, meanwhile, in his statement to Sergeant Highsmith, said that the Mitsubishi's speedometer indicated

he was going 65 miles per hour, which Swihart said meant that the car was going 55 miles per hour due to a malfunction. This evidence was sufficient for the jury to find that Swihart was driving between 47 and 65 miles per hour over the curve at the time of the accident, which was about double the suggested speed displayed in the curve warning road sign.

**{¶55}** This evidence, taken together and in the light most favorable to the State, suggested that Swihart knew of the curve and its risks, but that he perversely disregarded them by going nearly twice the suggested speed for the curve. *See State v. Moore*, 2d Dist. Montgomery No. 22904, 2009-Ohio-3766, ¶ 9-10 (finding sufficient evidence of recklessness to support aggravated vehicular homicide conviction where the defendant was driving 100 miles per hour on a "narrow, hilly, country road"). As a result, the evidence was sufficient to support a finding of recklessness on Swihart's part.

*Manifest Weight of the Evidence Standard*

**{¶56}** When an appellate court analyzes a conviction under the manifest weight standard, it "sits as the thirteenth juror." *Thompkins*, 78 Ohio St.3d at 387. Accordingly, it must review the entire record, weigh all of the evidence and its reasonable inferences, consider the credibility of the witnesses, and determine whether the fact finder "clearly lost its way" in resolving evidentiary conflicts and "created such a manifest miscarriage of justice that the conviction must be

reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1989). When applying the manifest weight standard, a reviewing court should only reverse a trial court's judgment "in exceptional case[s]" when the evidence "weighs heavily against the conviction." *Id.* at paragraph three of the syllabus.

**{¶57}** Having disposed of Swihart's sufficiency challenge of his conviction, we similarly reject his manifest weight challenge. Swihart correctly points out that there is no independent witness who saw him driving the Mitsubishi before the accident, but that does not provide a basis for reversal on manifest weight grounds. *See State v. Branch*, 3d Dist. Allen No. 1-12-44, 2013-Ohio-3192, ¶ 110 (rejecting manifest weight challenge where there was no independent witness who observed the alleged sexual conduct that gave rise to the defendant's conviction). Swihart also challenges the credibility of Sergeant Highsmith's testimony and the DNA analyses performed by the State's witnesses. Further, Swihart points out that there was conflicting testimony as to the speed he was traveling around the curve before the accident. Although Swihart attempted to impeach Sergeant Highsmith and the State's DNA analyses and offered alternative expert testimony, we are unable to find that the evidence supporting acquittal was so overwhelming as to render Swihart's conviction against the manifest weight of the evidence. *See State v. Wareham*, 3d Dist. Crawford No. 3-12-11, 2013-Ohio-3191, ¶ 25

("[J]urors are entitled to believe the testimony offered by the State's witnesses");

*State v. Clark*, 101 Ohio App.3d 389, 400 (8th Dist. 1995) ("It is well established

that the * * * credibility of witnesses [is] primarily [a] matter[] for the trier of

fact.").

{¶58} Accordingly, we overrule Swihart's second assignment of error.

*Assignment of Error No. III*

{¶59} Swihart argues that the trial court erred by failing to make a finding

about his objection to the PSI's allegation that he was laughing during the trial.

He contends that this failure violated R.C. 2951.03(B)(5) and voids his sentence.

We agree.

{¶60} R.C. 2951.03(B)(5) provides as follows:

> If the comments of the defendant or the defendant's counsel, the
> testimony they introduce or any of the other information they
> introduce alleges any factual inaccuracy in the presentence
> investigation report or the summary of the report, the court *shall* do
> either of the following with respect to each alleged factual
> inaccuracy:
>
> (a)   Make a finding as to the allegation;
>
> (b)   Make a determination that no finding is necessary with respect
> to the allegation because the factual matter will not be taken into
> account in the sentencing of the defendant.

(Emphasis added.) R.C. 2951.03(B)(5).  When interpreting this provision, we are

required to give the statutory language its customary meaning.  R.C. 1.42.

Further, it is our "duty * * * to give effect to the words used" and to refrain from

"insert[ing] words not used." *State ex rel. Cassels v. Dayton City School Dist. Bd. of Edn.*, 69 Ohio St.3d 217, 220 (1994). If we apply these precepts to the statutory language and find that the "statute is plain and unambiguous and conveys a clear and definite meaning, there is no need to apply rules of statutory interpretation." *State v. Taylor*, 114 Ohio App.3d 416, 422 (2d Dist. 1996).

**{¶61}** In drafting R.C. 2951.03(B)(5), the General Assembly chose the word "shall" to describe the trial court's duty when faced with a defendant's objection to a factual statement in the PSI. "Shall" is defined as "will have to" and is "used to express a command or exhortation" and "to express what is mandatory." *Webster's Third New International Dictionary* 2085 (2002). Courts have traditionally applied the same connotation to "shall" when interpreting statutes and the duties they impose. *E.g.*, *Anderson v. Yungkau*, 329 U.S. 482, 485, 67 S.Ct. 428 (1947) ("The word 'shall' is ordinarily '[t]he language of command'."), quoting *Escoe v. Zerbst*, 295 U.S. 490, 493, 55 S.Ct. 818 (1935); *Stephan v. State Veterinary Med. Bd.*, 113 Ohio App. 538, 543 (1st Dist. 1960) ("[T]he ordinary meaning of the word 'shall' is mandatory."); *see generally* Bryan A. Garner, *A Dictionary of Modern Legal Usage*, at 502 (1987) (describing the typical legal usage of "shall" as "ordinarily connot[ing] language of command"). Based on this common meaning of "shall," we find that R.C. 2951.03(B)(5) places

an affirmative duty on the trial court to make a finding regarding any objection raised by the defendant to a factual statement in a PSI.

**{¶62}** In applying this interpretation of R.C. 2951.03(B)(5) here, we find guidance from the Sixth District's decision in *State v. Jackson*, 6th Dist. Erie No. E-00-23 (Mar. 30, 2001).[4]  There, the defendant objected to a factual statement in the PSI, but the trial court failed to make a finding regarding the objection as required by R.C. 2951.03(B)(5).  The Sixth District subsequently vacated the defendant's sentence and remanded the matter for resentencing.  The court's reasoning for this result was as follows:

> Appellant failed to present any evidence to substantiate his claim that there were errors in the [PSI].  Nonetheless, we find that that the court had an obligation under R.C. 2951.03(B)(5) once the issue ha[d] been raised, to investigate the issue and determine whether there were any errors or whether the accuracy of the [PSI] was relevant to the sentencing hearing.  In this case, the court quoted the criminal record without addressing the factual accuracy of the [PSI].  The court then stated that in part based upon that record, appellant needed to be incarcerated for a lengthy period of time in order to protect the public.  Since the court failed to comply with R.C. 2951.03(B)(5), we find that it erred in sentencing Appellant.

*Id.*

**{¶63}** This matter presents a nearly identical factual scenario as the one addressed in *Jackson*, which compels us to reach the same result.  Here, Swihart's counsel orally objected to the PSI's factual statement that Swihart laughed during

---

[4] The parties have not cited, and we are unable to find, any case from this court interpreting R.C. 2951.03(B)(5).

the trial. As in *Jackson*, this placed an affirmative duty on the trial court to make a finding regarding the objection in accordance with R.C. 2951.03(B)(5). However, the trial court failed to make such a finding. Following *Jackson*'s guidance, this failure requires that we vacate Swihart's sentence and remand for resentencing.[5]

{¶64} The State makes three main arguments in support of affirmance. First, it contends that Swihart failed to "object at the time of sentencing to the court's failure to follow the dictates of R.C. 2951.03." Appellee's Br., p. 19. This argument is not supported in the record since Swihart's defense counsel clearly stated his objection to the PSI at the sentencing hearing, which preserved this issue for appeal.

{¶65} Second, the State asserts that there was no error in Swihart's sentencing since he failed to offer evidence in support of his objection. This argument is similarly unsupported in the record. Swihart's counsel stated on the record that he sat next to Swihart during the trial proceedings and that he never observed Swihart laugh or improperly behave. Swihart's counsel also noted that the trial court never admonished Swihart during the trial regarding his behavior.

---

[5] When imposing sentence, the trial court stated as follows: "The Court's considered the record, the joint sentencing recommendation, the oral statements of those who have spoken today, including the victim impact statements, the need for deterrence, incapacitation, rehabilitation, and restitution, the principles and purposes of sentencing under Revised Code Section 2929.12." Sentencing Tr., p. 18-19. We are unable to read this language as implicitly making a finding regarding Swihart's objection. *Compare State v. Mayor*, 7th Dist. Mahoning No. 07 MA 177, 2008-Ohio-7011, ¶ 27-28 (finding that the trial court "satisfied any duty imposed by R.C. 2951.03(B)(5)" where it indicated that it reviewed the narrative reports and overall factual situation and "essentially stated that it did not agree with [the defendant]'s contention of factual inaccuracy").

Even without these statements by Swihart's counsel, we would still find that the State's argument is unavailing. As indicated in *Jackson* and the plain terms of R.C. 2951.03(B)(5), the failure of a defendant to substantiate an objection to the PSI does not obviate the trial court's duty under the statute to make a finding regarding the objection.

{¶66} Finally, the State argues that even if the trial court erred in failing to make the necessary finding under R.C. 2951.03(B)(5), the error was harmless. Specifically, the State asserts that the error was harmless because the trial court did not consider the disputed statement in the PSI when sentencing Swihart. Assuming arguendo that harmless error analysis is proper when a trial court fails to comply with R.C. 2951.03(B)(5),[6] we still reject the State's argument. The assertion that the trial court did not consider the challenged factual statement in the PSI is unsupported since the trial court stated, without qualification, that it "considered the record" when sentencing Swihart. Sentencing Tr., p. 18. The record included the PSI and the challenged statement, so the trial court plainly stated that it considered those items. As such, the State's argument must necessarily fail.

---

[6] Some Ohio courts have applied harmless error analysis to a trial court's lack of compliance with R.C. 2951.03(B)(5). *E.g.*, *State v. Othman*, 149 Ohio App.3d 82, 2002-Ohio-4029, ¶ 22 (8th Dist.) ("[T]here is nothing in the record to suggest that the trial court took into consideration the disputed information when imposing sentence. Therefore, even if the trial court did not make the required finding, the failure would be, at most, harmless error."). We need not reach the question of whether the application of harmless error analysis to a trial court's lack of compliance with R.C. 2951.03(B)(5) is proper. However, for the purposes of this appeal, we have elected to address the State's argument without passing judgment as to the merits of *Othman*'s position that a trial court's violation of R.C. 2951.03(B)(5) may constitute harmless error.

{¶67} In support of this argument, the State cites to *State v. Collins*, 4th Dist. Gallia No. 03CA29, 2004-Ohio-3606. But, *Collins* is inapposite here. In that case, the Fourth District found that the trial court's failure to comply with R.C. 2951.03(B)(5) was harmless since "the trial court filed a written entry and explained that the alleged inaccuracies played no role in [the defendant]'s sentencing." *Id*. at ¶ 24. The trial court neither issued such an entry nor offered such an explanation in this matter. Consequently, we decline to apply *Collins*' reasoning here.

{¶68} In sum, the trial court failed to comply with R.C. 2951.03(B)(5). As such, we must vacate Swihart's sentence and remand this matter for resentencing.

{¶69} Accordingly, we sustain Swihart's third assignment of error.

{¶70} Having found no error in Swihart's first and second assignments of error, but having found error prejudicial to Swihart in his third assignment of error, we affirm Swihart's conviction but reverse the trial court's imposed sentence and remand this matter for re-sentencing in accordance with this opinion.

*Judgment Affirmed in Part,*
*Reversed in Part, and*
*Cause Remanded*

**WILLAMOWSKI and SHAW, J.J., concur.**

**/jlr**